## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:                                      )
                                            )
HENRY MICHAEL CURTIS BRANDLAND,    )        Case No. 16-11091-BFK
                                            )        Chapter 13
        Debtor.                             )

## MEMORANDUM OPINION
## SUSTAINING OBJECTIONS TO DEBTOR'S
## THIRD AMENDED CHAPTER 13 PLAN
## AND DISMISSING DEBTOR'S CHAPTER 13
## CASE SUA SPONTE

This matter is before the Court on Sara Odom's Objections to the Debtor's Third

Amended Chapter 13 Plan (for purposes hereof, "the Plan"). Docket Nos. 78 (Third Amended

Plan), 147 (Objections). The Court heard the evidence of the parties on February 10, 2017. For

the reasons stated below, the Court will sustain Ms. Odom's Objections on the ground of good

faith. 11 U.S.C. § 1325(a)(3). Further for the reasons stated below, the good faith objection to the

Debtor's Plan cannot be cured with an amended plan. The Court, therefore, will enter an Order

*sua sponte* dismissing the Debtor's Chapter 13 case.

### Procedural Background

The Debtor, Henry Michael Curtis Brandland, filed a voluntary petition under Chapter 13

with this Court on March 28, 2016. Docket No. 1. Ms. Odom, who is the Debtor's ex-wife, filed

a Motion to Dismiss the Case, or Alternatively, to Convert the Case to Chapter 7. Docket No. 38.

The Debtor filed a Response. Docket No. 49. The Court held a hearing on Ms. Odom's Motion

to Dismiss on September 23, 2016, at the conclusion of which it denied Ms. Odom's Motion.

Docket Nos. 66, 75 (Order Denying Motion to Dismiss).

In the meantime, Mr. Brandland filed a series of Chapter 13 Plans, all of which drew objections from the Chapter 13 Trustee as well as from Ms. Odom. Docket Nos. 10 (Chapter 13 Plan), 14 (Trustee's Objection), 20 (Ms. Odom's Objection), 26 (First Amended Plan), 27 (Trustee's Objection), 30 (Ms. Odom's Objection), 47 (Second Amended Plan), 50 (Trustee's Objection), 51 (Ms. Odom's Objection), 78 (Third Amended Plan), 147 (Ms. Odom's Objection). The Trustee did not object to the Debtor's Third Amended Plan, as he was satisfied that the Plan met the requirements for confirmation. Further, the Trustee and the Debtor agreed to a reporting requirement for Mr. Brandland's income that satisfied the Trustee's disposable income concerns, as more fully discussed below.

The Trustee also filed a Motion to Dismiss Mr. Brandland's bankruptcy case. Docket No. 28. When the Court denied Ms. Odom's Motion to Dismiss on September 23, 2016, it continued the Trustee's Motion to a later date. Docket No. 65. Ultimately, the Trustee withdrew his Motion to Dismiss the case. Docket No. 90.

In connection with her Objections to the Debtor's Third Amended Plan, Ms. Odom sought and was granted a series of Rule 2004 Examination Orders. In all, the Court granted eight (8) Rule 2004 Examination Orders at Ms. Odom's request, in advance of the confirmation hearing on the Debtor's Third Amended Plan. Docket Nos. 81 (Nathan Shapiro and Green Spring Carpets LLC), 83 (William Saul and Advantage Flooring, Inc.), 85 (WashingtonFirst Bank), 87 (John Kostakos), 115 (Paypal, Inc.), 123 (Lorraine Lorek), 125 (Branch Banking & Trust Company), 129 (JANZ, INC. (d/b/a Carpet Impressions)).

The confirmation hearing originally was set for November 10, 2016. However, Ms. Odom filed a Motion to Continue the confirmation hearing, owing to her outstanding discovery requests through the Rule 2004 process. Docket No. 92. The Court granted Ms. Odom's request

for a continuance and set the confirmation hearing for February 10, 2017. Ms. Odom was

permitted to testify via video connection from the U.S. Bankruptcy Court for the District of

Colorado in her place of residence, Denver. At the conclusion of the hearing, the Court took the

matter under advisement.

## FINDINGS OF FACT

The Court, having heard the evidence, makes the following findings of fact:

*A.   City Floorcoverings.*

1.      The Debtor has been in the carpet and flooring business all of his adult working

life.

2.      In January 2012, the Debtor entered into a Membership Subscription Agreement

for the purchase of a one-third interest in a business known as City Floorcoverings, LLC ("City

Floorcoverings").[1] DR Ex. 13. The purchase price for the Debtor's one-third interest in City

Floorcoverings was $100,000.00. *Id.*, Sec. 2.2. The Debtor paid this amount up front.[2]

3.      At the same time, in January 2012, the Debtor entered into a Membership Interest

Purchase and Redemption Agreement with the other two owners of City Floorcoverings, John

Kostakos and Segundo Quinones, both of whom had expressed a desire to retire and to exit the

business. DR Ex. 14.

4.      Under this Agreement, the Debtor agreed to purchase Mr. Kostakos's and Mr.

Quinones's two-thirds (66.67%) interests in the business. *Id*. The aggregate purchase price for

---

[1] City Floorcoverings is also referred to in the singular as "City Floorcovering" or with a space as "City Floor Coverings" in a number of exhibits. *See, e.g.,* DR Ex. 13 (Membership Subscription Agreement - "City Floorcovering , LLC"), 14 (Membership Interest Purchase and Redemption Agreement - "City Floorcoverings, LLC"), 29 (2014 W-2 – "City Floorcovering, LLC"); ODOM Ex. B (Transcript of Judge Kasabian's Ruling of January 15, 2014 – "City Floor Covering"), OO (Brandland 2013 K-1 – "City Floorcovering LLC"). The variations in the name all refer to the same entity and the Court treats them as such.

[2] The Debtor's Exhibits will be referred to herein as "DR Ex. __." Ms. Odom's Exhibits will be referred to herein as "ODOM Ex. __."

3

100% of the business was $500,000.00. *Id*., Sec. 1.1. As noted, the Debtor had already paid

$100,000.00 for his one-third interest in the business. The remaining $400,000.00 was due and

payable by December 31, 2013, two years after the parties entered into the Membership Interest

Purchase and Redemption Agreement. *Id.*, Secs. 1.1, 2.1. During this two-year period, the

Debtor's distributions would be escrowed in order to pay the remaining $400,000.00 when it

became due and payable. *Id*., Sec. 1.2.3.1.

5.      The Debtor's 2012 tax return indicates that he had $206,970.00 in income from

City Floorcoverings during that year. The Debtor testified that he received $74,000.00 in salary,

so he estimated that Mr. Kostakos and Mr. Quinones escrowed approximately $130,000.00

pursuant to the terms of the Membership Interest Purchase Agreement (on which he was

obligated to pay income taxes). DR Ex. 27, line 17; ODOM Ex. NN ($130,393.00 increase in

capital account).

6.      The Debtor estimated that he needed approximately $1.5 million in working

capital to operate City Floorcoverings when he expected to take it over in January 2014.

However, he was unable to secure any bank financing. He attributes his inability to secure any

financing to the fact that his divorce was pending at the time.

7.      As the December 31, 2013 closing date under the Membership Interest Purchase

Agreement approached, the Debtor began negotiations again with Mr. Kostakos and Mr.

Quinones. On December 31, 2013, the Debtor entered into a Settlement and Membership Interest

Redemption Agreement with Mr. Kostakos and Mr. Quinones. DR Ex. 15 (hereinafter, the

"Redemption Agreement").

8.      Under the Redemption Agreement, the Debtor agreed to sell his one-third interest in City Floorcoverings back to Mr. Kostakos and Mr. Quinones for a purchase price of $150,000.00. *Id.*, Sec. 4.

9.      The $150,000.00 check was dated January 10, 2014. DR. Ex. 19.

10.     The parties also agreed that: (a) there would be no adjustments to the Debtor's 2012 tax return (which included $130,000.00 in escrowed distributions as income); but (b) the Debtor would show an $80,000.00 loss on his 2013 tax return. DR Ex. 15, Secs. 4, 8; ODOM Ex. OO (2013 K-1; -80,393.00 decrease in capital account).

11.     The Debtor received the $150,000.00 purchase price. His accounting of how he spent the funds is found at DR Ex. 20.[3]

*B. The Parties' Divorce.*

12.     The Debtor and Ms. Odom were married in 2002. They separated in June 2012, after which Ms. Odom initiated divorce proceedings against the Debtor in the Circuit Court of Fairfax County.

13.     Prior to the Circuit Court hearing on equitable distribution, the parties engaged in pre-trial discovery. The Debtor was clearly untruthful in his deposition testimony on August 14, 2012, when he testified as follows:

> Q. I am still a little confused as to your relationship with the people of City Floors. It is your intention to buy the two partners out?
> A. Correct.
> Q. And you're a partner at this time?
> A. I am considered in some respects a partner, but *I have no ownership*. I don't have the – I have made no payment towards the company.
> Q. I thought you gave them $100,000.00?
> A. That strictly for cash flow. *That wasn't towards the purchase of the business*.

---

[3] The Court admitted the top half of Exhibit 20, but sustained Ms. Odom's objection to the bottom half of Exhibit 20 as hearsay.

ODOM Ex. RR, p. 63 (emphasis added).

14.     In fact, the Debtor had already paid $100,000.00 for a one-third interest in the

business pursuant to the Membership Subscription Agreement entered into on January 9, 2012.

DR Ex. 13.

15.     The parties tried their divorce case before the Honorable Brett Kassabian, Circuit

Court Judge, of the Fairfax County Circuit Court on December 17 and 18, 2013. DR Ex. 1.

16.     On January 15, 2014, the Debtor and Ms. Odom appeared before Judge Kassabian

for his oral rulings in the case. ODOM Ex. B. During the course of the hearing, Judge Kassabian

valued Mr. Brandland's one-third interest in City Floor Coverings, LLC, at $689,000.00. *Id*., p.

15. Judge Kassabian's valuation of City Floorcoverings was based on Ms. Odom's expert's

valuation, that of Mr. Early. ODOM Ex. J.

17.     The Debtor did not disclose to Judge Kassabian at the January 15th hearing that as

of December 31, 2013, he had already entered into an agreement for the repurchase of his one-

third interest in City Floorcoverings for $150,000.00, and that he received the funds for the

purchase on or about January 10, 2014. ODOM Ex. B.

18.     At the conclusion of the January 15th hearing, the parties and their counsel went

into a small conference room outside of the courtroom, and drafted a handwritten, two-page

Term Sheet, which: (a) after various setoffs and credits, obligated the Debtor to pay Ms. Odom

the sum of $201,380.00; and (b) set out a payment schedule for the payment of this amount in

annual installments. ODOM Ex. A.

19.     The first installment, in the amount of $14,384.28, was due on June 1, 2015. *Id.*

Subsequent installments were due on April 1st of each succeeding year through 2020. *Id*. This

payment schedule required Mr. Brandland to pay Ms. Odom $38,358.09 in the years 2016

through 2018, $28,768.57 in 2019 and the final payment of $43,152.85 in 2020. *Id.*[4]

20.     The Debtor testified in this proceeding that he entered into the Term Sheet based

on his understanding of his tax situation that he would receive refunds from the IRS in sufficient

amounts to make the installment payments. Unfortunately, because he was behind on his taxes

and had entered into a payment plan with the IRS, there were no tax refunds available to pay the

amounts agreed upon in the Term Sheet with Ms. Odom.

21.     The Debtor did not advise Ms. Odom during the course of the discussion on

January 15, 2014, that he had already entered into an agreement for the repurchase of his one-

third membership interest in City Floorcoverings for $150,000.00, and that he had the

$150,000.00 sitting in a bank account at the time.

22.     On March 14, 2014, the Circuit Court entered a Final Decree of Divorce, which

incorporated the Term Sheet as an attachment. ODOM. Ex. A.

23.     No funds were paid to Ms. Odom on account of the Circuit Court's equitable

distribution award out of the $150,000.00 redemption payment other than $10,500.00 for her

legal fees, $4,314.61 for a Gap Visa and $2,163.71 for Aetna. DR Ex. 20; ODOM Ex. A.

24.     June 1, 2015, came and went with no payment from Mr. Brandland. Ms. Odom

filed for a Rule to Show Cause, which was issued on September 2, 2015. ODOM Ex. C, D.

25.     The Circuit Court found Mr. Brandland to be in contempt for his failure to pay the

June 15th payment. ODOM Ex. G.

26.     In October 2015, Mr. Brandland filed a Motion to Amend the Divorce Decree

*Nunc Pro Tunc*, arguing that Judge Kassabian had made a mathematical error in valuing Mr.

---

[4] The Court notes a typographical error in the calculation of each of these payments, which amount to $201,3_79_.97, and not as listed in Term Sheet, which states an amount of "$201,3_97_.97." *See* ODOM Ex. A.

Brandland's one-third interest in City Floor Coverings, LLC, at $689,000.00. DR. Ex. H. Mr.

Brandland argued that Judge Kassabian intended to value *100%* of the business at $689,000.00,

so that Mr. Brandland's one-third interest should have been valued at $229,666.67 (and Ms.

Odom would be entitled to one-half of that number, or $114,833.33). *Id*., p. 2.

27.     The Debtor did not disclose to the Circuit Court in his Motion to Amend that he

had entered into an agreement for the repurchase of his one-third interest in City Floorcoverings

for $150,000.00 in December 2013, and that the money had already been spent. *Id*.; DR Ex. 20

(reflecting that the last payment exhausting the $150,000.00 redemption payment had occurred

on April, 29, 2014).

28.     The Circuit Court denied Mr. Brandland's Motion to Amend, finding that it

intended to value the Debtor's one-third interest in City Floorcoverings at $689,000.00. ODOM

Ex. K.

29.     On October 16, 2015, the same day it denied Mr. Brandland's Motion to Amend,

the Circuit Court remanded Mr. Brandland to the custody of the Sheriff, with bond set at the

amount of $16,884.28, this being the amount of the June 15th installment payment plus interest

and legal fees. ODOM. Ex. L.

30.     After being incarcerated for some period of time in the Fairfax County Adult

Detention Center, Mr. Brandland was released when his mother delivered a cashier's check in

the amount of the bond to Ms. Odom's attorneys.

        *C.   Floor Covering Resources.*

31.     By 2015, the Debtor had acquired an interest in a commercial carpet business

known as Floor Covering Resources, Inc. ("Floor Covering Resources"). *See* ODOM Ex. PP.

According to the Debtor's 2015 K-1 for Floor Covering Resources, Floor Covering Resources

was incorporated in January 2005 and as of the tax year 2015, the Debtor held a 100% ownership

interest in the business. *Id.*, Line E & Schedule K-1.

32.     In April 2015, while the Debtor was still an employee at City Floorcoverings, Mr.

Kostakos and Mr. Quinones advised the Debtor that they would close City Floorcoverings in

nine days. The Debtor then began working for Floor Covering Resources, on May 1, 2015.[5]

33.     On August 31, 2015, Floor Covering Resources, as the seller, entered into an

Asset Purchase Agreement with Greenspring Carpets, Inc. ("Greenspring"), a Maryland

corporation, as the purchaser. DR Ex. 25.[6]

34.     Under this Asset Purchase Agreement, Floor Covering Resources sold all of its

assets to Greenspring. There was no cash to Floor Covering Resources or to the Debtor; rather,

Greenspring assumed approximately $300,000.00 in liabilities plus the showroom lease. *Id.*,

Asset Purchase Agreement Exhibit 1.06.[7]

35.     Although the Debtor did not receive any cash from this transaction, it should be

noted that in the handwritten attachment to the parties' Final Decree of Divorce, the Debtor

received a credit in the amount of $99,325.00 for "FCR Debt," debt that was assumed by

Greenspring in the Asset Purchase Agreement in August 2015.[8]

---

[5] According to the Debtor's personal tax returns, the Debtor received W-2 income from Floor Covering Resources in 2012, 2013 and 2014. DR Ex. 27-29.

[6] Greenspring Carpets, Inc. is also referred to as Green Spring Carpets, LLC in the Exhibits received by the Court. These references refer to the same entity and the Court treats them as such. *See* ODOM Ex. Y, Z, AA.

[7] Nathan Shapiro, the owner of Greenspring, testified that he "merged" Floor Covering Resources into Greenspring Carpets, Inc., but he was mistaken; the agreement was structured as an asset purchase agreement of Floor Covering Resources' assets. The Debtor caused a tax return to be filed for Floor Covering Resources for 2015, which he was entitled, if not required, to do as the 100% owner of Floor Covering Resources both before and after the asset sale. ODOM Ex. PP.

[8] Judge Kassabian ascribed no value to Floor Covering Resources in the divorce case, though in the Term Sheet the parties agreed to an allocation of one-half of the business debts to each other. ODOM Ex.A; ODOM Ex. B, pp. 15-16.

36.     After the sale in August 2015, the Debtor continued to work as an employee for
Greenspring, managing the store and as a salesperson. He was an authorized signatory on the
Floor Covering Resources bank account at Wells Fargo, until the business was closed in October
2016. He had a salary of $150,000.00 per year plus a car allowance. He did not have health
insurance coverage, nor a 401K plan, with Greenspring.

37.     Mr. Shapiro further testified that the Debtor and he negotiated for a 5% interest in
the profits of Floor Coverings Resources, which Greenspring continued to use as a trade name
for the storefront operated by the Debtor, but that the parties "never got to that point;" that is, the
business never reached profitability, so the 5% never came into being.

   D.  *The Debtor's Schedules and Proposed Third Amended Plan.*

38.     With the second equitable distribution payment looming on April 1, 2016, in the
amount of $38,358.09, the Debtor filed a Chapter 13 petition with this Court, three days before
the payment was due, on March 28, 2016. ODOM Ex. M; Docket No. 1.

39.     In his Statement of Financial Affairs, the Debtor stated "No" in response to the
question on whether he had made any insider payments within the year preceding his bankruptcy
filing. ODOM Ex. M, p. 42 ("Include payments for domestic support obligations, such as child
support and alimony.") In fact, the Debtor was regularly making spousal support and child
support payments during the year preceding the bankruptcy filing.

40.     The Debtor also answered "No" in response to the question on whether he was a
party to any lawsuits or court actions within one year prior to his bankruptcy case. *Id.*, p. 43. The
Debtor's Motion to Modify the Term Sheet Payout and to Modify Support was pending within
the year preceding his case. ODOM Ex. F (Circuit Court Order, 9/16/2015). Further, his Motion

for Order *Nunc Pro Tunc* was pending during the year preceding his bankruptcy filing. ODOM

Ex. H (Motion), K (Order Denying).

41.    The Debtor also answered "No" to the question on whether within two years of

the filing of his bankruptcy case he transferred any property other than in the ordinary course of

business. ODOM Ex. M, p. 46.[9]

42.    The Debtor did, however, list his ownership interest in Floor Covering Resources

as having ended on May 1, 2015. *Id.*, p. 49.

43.    The Debtor has no secured creditors. The IRS filed a proof of claim in the amount

of $19,679.96, claiming $18,774.29 as priority debt. ODOM Ex. T, p. 1. Two creditors filed a

total of three proofs of claim for unsecured credit card debts in the amount of $36,352.08. *Id.*, pp.

1-3 (Claim Nos. 2, 3, 7). The Debtor also listed three family members, his mother his father and

his sister, in the amounts of $16,884.28 (the amount that released the Debtor from custody),

$10,000.00 and $2,000.00, respectively. ODOM Ex. M, pp. 25-27. His sister filed a claim for the

$10,0000.00; his mother and father did not file claims. ODOM Ex. T. In addition, the Debtor

listed his former divorce counsel with a debt in the amount of $24,935.52, who did file a proof of

claim. ODOM Ex. M, p. 27; ODOM Ex. T. He listed Ms. Odom with a claim in the amount of

$187,000.00, who also filed a claim. *Id.*

44.    The Debtor's Third Amended Plan calls for payments of $905.73 per month for

54 months, plus $3,900.00 that the Debtor has already paid into the Plan. Docket No. 78, p. 2.

The total plan funding equals $52,809.42. *Id*. The Plan would pay unsecured creditors a total of

11% over the life of the Plan. *Id.*, p. 3. The Plan would pay the IRS priority debt in full. It would

---

[9] The Debtor's testimony on this point was less than convincing. He testified that he read the "other than in the ordinary course of business" language in the SOFA to limit the required response to transfers of personal property – i.e., his personal residence, cars and the like. In fact, the question calls for the disclosure of *any* transfers *other than* ordinary course transfers (e.g., buying groceries or paying the monthly bill for electricity). In any event, the sale to Greenspring was a sale of the assets of FCR, not of the Debtor.

result in a payment of approximately $19,000.00 to Ms. Odom, without interest, over the 60

months of the Plan, at the conclusion of which the Debtor would receive a discharge of his

unsecured debt.

> *E. The Debtor's Current Employment.*

45.     Currently, the Debtor is employed as a sales person with JANZ, Inc., doing

business as Carpet Impressions, in McLean, Virginia.

46.     Mr. Amin, the owner of Carpet Impressions, testified that the Debtor started with

Carpet Impressions on November 28, 2016. The Debtor works on a commission basis. He is

given a bi-weekly draw of $5,000.00, which is credited to his commissions if he has earned

commissions in excess of the $5,000.00, bi-weekly (but, he is not debited if he is entitled to less

than that amount in commissions). The Debtor also is paid $125.00 bi-weekly for health

insurance and he is entitled to fifty-five cents ($0.55) per mile for his vehicle.

47.     His agreement with Carpet Impressions is short term – only through March 1,

2017. The Court is not aware of whether this arrangement has been extended post-March 1st.

> *F. The Debtor's Post-Petition Domestic Support Obligations.*

48.     With only certain limited exceptions, the Debtor is current on his domestic

support obligations.

49.     Just before the hearing in this matter, the Debtor set off $380.00 in spousal

support against Ms. Odom's obligation to reimburse him a certain percentage (22.5%) of the

unreimbursed costs of the children's medical bills (some of which Ms. Odom agreed with; other

costs she disputed). He recognized, with the advice of his counsel, that he was not entitled to set

off this amount. He delivered a check in the amount of $380.00 to Ms. Odom at start of the

hearing in this matter.

50.     The day before the hearing in this case Ms. Odom took one of the children to the

doctor. Under the Circuit Court's Order of September 16, 2015, reducing the Debtor's spousal

support obligation, the Debtor was required to keep a credit card on file with the children's

primary health care providers for any unreimbursed expenses. The Debtor acknowledges that he

has not maintained a credit card on file with the children's physicians, but asserted that this is

because he does not have a credit card. Ms. Odom was required to pay $50.00 in a co-payment to

one of the children's physicians at this visit.

51.     Finally, Ms. Odom and the Debtor agreed to maintain a sample of the children's

cord blood with ViaCord, a cord blood bank, when their children were born. This costs $95.00

and $125.00 per year for the two children, respectively. The Debtor has not paid these amounts

for 2016.[10]

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of

Reference entered by the U.S. District Court for this District on August 15, 1984. This is a core

proceeding under 28 U.S.C. § 157(b)(2)(L) (confirmation of plans).

The Debtor bears the burden of proof with respect to all of the statutory requirements for

confirmation, by a preponderance of the evidence. *In re Cole*, 548 B.R.132, 141 (Bankr. E.D.

Va. 2016); *In re Colston,* 539 B.R. 738, 746 (Bankr. W.D. Va. 2015).

---

[10] Both the Final Decree of Divorce and the September 16, 2015, Order used the phrase "all reasonable and necessary unreimbursed medical or dental expense[s]." ODOM Ex. A, ¶ 3; ODOM Ex. F, p. 2. Although banking the children's cord blood might be a prudent measure, the benefits are not immediately apparent. *See Is Cord Blood Banking Worth the Cost? Here's What the Experts Say*, http://www.nbcnews.com/business/consumer/cord-blood-banking-n400561 (July 29, 2015, 2:59 p.m. EST) ("The chance of baby later benefiting from his or her own banked cord blood is currently less than 0.04 percent, according to the ASBMT [American Society for Blood and Marrow Transplantation].") The Court finds that this is not a "*necessary*" expense within the terms of the two Orders. The Debtor's failure to pay these amounts, therefore, does not constitute a default in the payment of his domestic support obligations.

Ms. Odom has raised a series of objections to the Debtor's Third Amended Plan. The Court will address each objection, in turn.

### I.      Section 109(e) – the Regular Income Requirement.

Bankruptcy Code Section 109(e) requires the Debtor to have regular income in order to be eligible for Chapter 13. 11 U.S.C. § 109(e). The term "individual with regular income" means an individual "whose income is sufficiently stable and regular to enable such individual to make payments" under the debtor's Chapter 13 plan. 11 U.S.C. § 101(30). In this case the Debtor is employed at Carpet Impressions. He has bi-weekly draws of $5,000.00, which are credited against his commission income if he exceeds that amount in commissions. Conversely, his income will not be less than $5,000.00, even if he does not meet that target in commission income.

Although Mr. Amin testified that the Debtor's employment arrangement is up for renewal as of March 1, 2017, eligibility under Section 109(e) is determined as of the filing of the petition. *In re Robinson*, 535 B.R. 437, 443 (Bankr. N.D. Ga. 2015); *In re Jurgens*, Case No. 15-60592-13, 2015 WL 6163511 (Bankr. D. Mont. Oct. 20, 2015). The Court is satisfied that the Debtor has met the regular income requirement for eligibility under Section 109(e) of the Code. The Court overrules this objection.

### II.     The Disposable Income Requirement.

Ms. Odom argues next that the Debtor has not met the disposable income requirement for confirmation of his Chapter 13 Plan. 11 U.S.C. § 1325(b)(2). Ms. Odom asserts that because the Debtor's income is commission-based, there is a risk that the Debtor may not be contributing all of his disposable income to the Plan. This problem, however, is solved by two methods in this case. First, the Debtor will be required to turn over his tax returns annually to the Chapter 13

14

Trustee, as all Debtors in this District are required to do. The Trustee, therefore, will be able to determine whether there is a substantial increase in the Debtor's income.

Second, the Trustee and the Debtor's counsel have agreed to a quarterly reporting requirement that that will be incorporated into the Order confirming the Debtor's Plan. If either the tax returns or the quarterly reports indicate a "substantial and unanticipated" increase in income, the Trustee can file a motion to modify the Plan under Section 1329(a) of the Code. *In re Murphy*, 474 F.3d 143 (4th Cir. 2007).

The Court finds that the production of the Debtor's tax returns, together with the quarterly reporting requirement, ensure that all of the Debtor's income will be accounted for and that he will be required to devote all of his disposable income to the Plan. The Court overrules this objection.

### III.     The Debtor's Domestic Support Obligations.

Ms. Odom's third objection is that the Debtor is not current in his domestic support obligations. Domestic support obligations are accorded the highest priority for payment under the Code. 11 U.S.C. § 507(a)(1). In order to gain confirmation of a plan, the debtor must be current in all post-petition domestic support obligations. 11 U.S.C. § 1325(a)(8). Domestic support obligations are not dischargeable in Chapter 13. 11 U.S.C. §§ 1328(a)(2), 523(a)(5). Further, the debtor must certify that he or she is current on all domestic support obligations in order to receive a discharge. 11 U.S.C. § 1328(a).

In this case, Ms. Odom asserts that the Debtor has not paid: (a) the $380.00; (b) a $50.00 co-pay; and (c) the ViaCord expenses. The Debtor, however, delivered a check to Ms. Odom on the morning of the hearing in this case for $380.00. The $50.00 co-pay was incurred the day before the hearing in this matter. Mr. Brandland is in default of his obligation to maintain a credit

card with the children's primary health care provider. The Debtor, on the other hand, testified

that he is unable to obtain a credit card, given his financial circumstances. The Court understands

the importance of these obligations to Ms. Odom and does not intend to minimize their

importance to her. The Court will not, however, allow a $50.00 co-pay that was incurred the day

before the hearing on confirmation in this case to derail the Debtor's Chapter 13 case.[11]

Finally, the Court has already found, above, that the Debtor's failure to pay the ViaCord

expenses does not constitute a failure to pay "necessary" medical expenses under the two State

Court Orders. *See* fn. 10, above. Accordingly, the Debtor's failure to pay the ViaCord expenses

does not constitute a default in the payment of his domestic support obligations.

The Court will overrule this objection.

## IV.    The Best Interests of Creditors Test.

Ms. Odom's more substantive objections to confirmation are her best interests of

creditors objection and her good faith objection, discussed below. In her best interests of

creditors objection, Ms. Odom argues that the best interests test has not been met because the

bankruptcy estate may have fraudulent transfer claims or voluntary conveyance claims against

Mr. Kostakos and Mr. Quinones arising out the repurchase of the Debtor's one-third interest in

City Floorcoverings for $150,000.00 in December 2013 – January 2014. DR Exs. 15-19.

The Debtor filed his petition in this case on March 28, 2016, more than two years after

the date of the transfer (the latest date from which the two years would run would have been

January 10, 2014, the date of the $150,000.00 check). DR Ex. 19. Neither Section 548(a)(1)(A)

of the Bankruptcy Code (transfers made with actual intent to hinder, delay or defraud creditors)

nor Section 548(a)(1)(B) (transfers for less than reasonably equivalent value while the debtor

---

[11] If the Court were to confirm the Debtor's Plan, it would order that this amount be paid without further delay.

was insolvent or was rendered insolvent or left with unreasonably small capital), would be

available to a Chapter 7 Trustee to avoid the repurchase of the Debtor's one-third interest in City

Floorcoverings because the transfer is outside of the two year lookback period under Section

548. Rather, the hypothetical Chapter 7 Trustee would be left with Section 544(b) and the rights

of State law creditors under Virginia Code Sections 55-80 (transfers made with actual intent to

hinder, delay or defraud creditors) and 55-81 (transfers for no consideration made at a time when

the transferor was insolvent or was rendered insolvent). The Court will analyze the City

Floorcoverings repurchase transaction under each statute.[12]

A. *Virginia Code Section 55-80.*

Section 55-80 provides as follows:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or
> personal, every suit commenced or decree, judgment or execution suffered or obtained
> and every bond or other writing given with intent to delay, hinder or defraud creditors,
> purchasers or other persons of or from what they are or may be lawfully entitled to shall,
> as to such creditors, purchasers or other persons, their representatives or assigns, be void.
> This section shall not affect the title of a purchaser for valuable consideration, unless it
> appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud
> rendering void the title of such grantor.

Va. Code § 55-80.

In discerning the transferor's intent, the courts routinely look to badges of fraud. These

badges include, but are not limited to:

> (1) retention of an interest in the transferred property by the transferor; (2) transfer
> between family members for allegedly antecedent debt; (3) pursuit of the transferor or

---

[12] The sale of the Floor Covering Resources assets, on the other hand, was negotiated in May 2015, and closed on
August 31, 2015, within 2 years of the Debtor's bankruptcy petition. DR Ex. 25. However, not even Ms. Odom saw
any value in Floor Covering Resources. Its assets were sold in exchange for Greenspring's assumption of the debt
and the showroom lease. Ms. Odom described her divorce case as a "one business case," meaning it involved the
value of City Floorcoverings, not Floor Covering Resources. No evidence was presented in this case to suggest that
the assets of Floor Covering Resources had any value over the aggregate amount of the debt. The agreement to pay
the Debtor 5% of any profits never came to fruition. Further, the assets were those of Floor Covering Resources, not
those of the Debtor individually. The sale of Floor Covering Resources' assets, therefore, does not figure into the
liquidation analysis.

threat of litigation by his creditors at the time of the transfer; (4) lack of or gross inadequacy of consideration for the conveyance; (5) retention or possession of the property by transferor; and (6) fraudulent incurrence of indebtedness after the conveyance.

*Hyman v. Porter (In re Porter),* 37 B.R. 56, 63 (Bankr. E.D. Va. 1984).

Ms. Odom argues that there are a number of badges of fraud here. First, the Debtor entered into the agreement to sell his one-third interest in City Floorcoverings on December 31, 2013, at a time when his divorce case was pending. Second, the purchase price of $150,000.00 was, in Ms. Odom's estimation, unreasonably low, in comparison to Judge Kassabian's valuation of the Debtor's one-third interest at $689,000.00. The Debtor attempted to conceal his one-third interest in pre-trial discovery in the State court when he testified that the $100,000.00 that he paid was only for "cash flow," and not for the purchase of the one-third interest.

Ms. Odom argues further that the transfer was one to "insiders," but it is doubtful that Mr. Kostakos and Mr. Quinones would be considered insiders of the Debtor when they were purchasing the Debtor's one-third interest in City Floorcoverings. Ms. Odom also argues that the Debtor was rendered insolvent by the redemption, but there was no expert evidence presented on solvency as of December 2013, so the Debtor's solvency would be an open issue.

Ms. Odom relies heavily on the Debtor's letter to Mr. Kostakos and Mr. Quinones of November 26, 2013, leading up to the sale, in which he stated:

> According to my accountant I have received $74,827.00 in pay for 2012 and pay for 2013 will be around $110,000.00.
> A one third profit share for 2012 was $132,143.00 and the 2013 one third profit share will be roughly $195,000.00.
> That will mean that I am leaving approximately $327,143.00 on the table.

ODOM Ex. II.

She buttresses her conclusion on the alleged fraudulent nature of the transfer with her Exhibit XX, which indicates that after the December 31, 2013, sale, Mr. Kostakos and Mr.

Quinones received roughly $2,081,000.00 in distributions from the business. ODOM Ex. XX. One third of this amount, she argues, would be $693,666.00, a figure remarkably consistent with Judge Kassabian's valuation of the Debtor's one-third interest at $689,000.00. In Ms. Odom's view, if we take the difference between what Mr. Kotakos and Mr. Quinones actually paid ($150,000.00) for the Debtor's one-third interest, and the $689,000.00 valuation, the Debtor is not accounting for $539,000.00 in his liquidation analysis.

Still, the Court does not view the potential for a fraudulent transfer claim against Mr. Kostakos and Mr. Quinones as anything close to a certainty. As noted above, it is unlikely that Mr. Kostakos and Mr. Quinones would be considered insiders of the Debtor for purposes of this transfer. The Court has not heard any evidence on the Debtor's insolvency at the time of the redemption in December 2013. Importantly, the one badge of fraud that would be of critical importance here, the retention of some financial interest in the business, is lacking. The Debtor retained no benefit whatsoever in the City Floorcoverings business for himself or anyone with whom he was affiliated after the sale. It is difficult to see what would have motivated the Debtor to fraudulently sell his one-third interest back to Mr. Kostakos and Mr. Quinones, allegedly at a bargain basement price, where the Debtor did not retain any prospective benefit. If his only intent was to deprive Ms. Odom of the benefit of his one-third ownership, he could have just defaulted on the original purchase agreement, at which point he would have forfeited the interest for nothing. The $150,000.00 purchase price was the product of arms-length bargaining where, the Debtor testified (convincingly, at least on this point), that he had no negotiating leverage whatsoever and was left in a "take it or leave it" position. A hard bargain is not the same thing as a fraudulent transfer, as long as the parties dealt with each other at arms-length and the transferor retains no interest in the property transferred.

In the end, the Court is unable to ascribe any real value to the allegation that the

redemption of the Debtor's one-third interest was a transfer made with the intent to hinder, delay

or defraud the Debtor's creditors, despite the presence of a number of alleged badges of fraud.

The Court finds that the Debtor has met his burden with respect to the liquidation test on this

claim.

> B. *Virginia Code Section 55-81.*

Virginia Code Section 55-81 provides as follows:

> Every gift, conveyance, assignment, transfer or charge which is not upon consideration
> deemed valuable in law, or which is upon consideration of marriage, by an insolvent
> transferor, or by a transferor who is thereby rendered insolvent, shall be void as to
> creditors whose debts shall have been contracted at the time it was made, but shall not, on
> that account merely, be void as to creditors whose debts shall have been contracted or as
> to purchasers who shall have purchased after it was made. Even though it is decreed to be
> void as to a prior creditor, because voluntary or upon consideration of marriage, it shall
> not, for that cause, be decreed to be void as to subsequent creditors or purchasers.

Va. Code § 55-81.

Section 55-81, like Bankruptcy Code Section 548(a)(1)(B), is a constructive fraud statute.

Unlike Section 548(a)(1)(B), however, Section 55-81 does not contain a "reasonably equivalent

value" standard. Rather, Section 55-81 provides for the avoidance of transfers where there is no

consideration at all. The phrase "upon consideration deemed valuable in law" refers to "*any*

valuable consideration received by the transferor." *In re Meyer*, 244 F.3d 352, 355 (4th Cir.

2001) (citing *Moore v. Manson (In re Springfield Furniture, Inc.),* 145 B.R. 520, 533 (Bankr.

E.D. Va. 1992)) (emphasis in original); *In re LandAmerica Financial Group, Inc.,* Case No. 08–

35994–KRH, APN 10–03819–KRH, 2014 WL 2069651 (Bankr. E.D. Va. May 19, 2014).

In the *LandAmerica* case, Judge Huennekens held:

> The requirement of consideration deemed valuable at law set forth in Virginia Code §
> 55–81 is a substantially lower standard than that required under 11 U.S.C. § 548(a)(1)(B).
> This Court has held that "[a]s long as something [is] gained, that is enough

[compensation] to prevent avoidance of the transaction under Virginia Code § 55–81." *See In re James River Coal Co.*, 360 B.R. 139, 167 (Bankr.E.D.Va.2007) (quoting *C–T of Virginia v. Euroshoe Associates,* 762 F.Supp. 675 (W.D.Va.1991), *aff'd*, 953 F.2d 637 (4th Cir.1992)).

2014 WL 2069651, *5.

In this case, there isn't any question that Mr. Kostakos and Mr. Quinones paid $150,000.00 for the Debtor's one-third interest in City Floorcoverings. The transfer, therefore, cannot be avoided under Va. Code § 55-81, and cannot form the basis for a liquidation test objection. The Court overrules the liquidation test objection insofar as it is based on a Section 55-81 claim.

### V.       The Debtor's Good Faith.

The Court turns finally to Ms. Odom's objection on the grounds of bad faith. As noted above, the Court has already denied Ms. Odom's Motion to Dismiss this bankruptcy case. The Debtor's good faith in proposing a plan, however, is an independent requirement for confirmation. 11 U.S.C. § 1325(a)(3). "The obligation of good faith is imposed on the debtor at two stages in a Chapter 13 proceeding; first, the debtor must file the petition for Chapter 13 bankruptcy in good faith, and second, the debtor must file the Chapter 13 plan in good faith." *In re Colston*, 539 B.R. at 746 (quoting *In re Tomer*, Civil Action No. 4:09CV0008, 2009 WL 2029798, at *4 (W.D. Va. July 14, 2009)).

In *Deans v. O'Donnell*, the Fourth Circuit held that, with respect to good faith, "[b]roadly speaking, the basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [the Chapter] in the proposal or plan . . . ." 692 F.2d 968, 972 (4th Cir. 1982) (quoting 9 Collier on Bankruptcy 9.20 at 319 (14th ed. 1978)). The Fourth Circuit held that a non-exclusive list of factors might include:

> not only the percentage of proposed repayment, but also the debtor's financial situation, the period of time payment will be made, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor.

*Id*. The totality of the circumstances must be examined on a case by case basis. *Id.; see also*

*Neufeld v. Freeman*, 794 F.2d 149 (4th Cir. 1986). The burden of proof rests with the Debtor to

prove good faith in the confirmation of his Plan. *In re Colston*, 539 B.R. at 749; *In re Taylor,* 261

B.R. 877, 885 (Bankr. E.D. Va. 2001).

Ms. Odom identifies a number of factors that she describes as bad faith conduct on the

part of the Debtor. The Court will address each of her concerns.

A.   *The Discharge of Debt that Would Not Be Dischargeable in Chapter 7.*

Ms. Odom argues first that the Debtor is seeking to discharge her equitable distribution

award, an obligation that would not be dischargeable in a Chapter 7 case. In *Neufeld*, the Fourth

Circuit held that "although the discharge of an obligation which would be nondischargeable in

Chapter 7 is not, standing alone, a sufficient basis on which to find bad faith or deny

confirmation, it is a relevant factor to be considered in the § 1325(a)(3) good faith inquiry." 794

F.2d at 152. The Court went on to say:

> Resort to the more liberal discharge provisions of Chapter 13, though lawful in itself, may well signal an "abuse of the provisions, purpose, or spirit" of the Act, *especially where a major portion of the claims sought to be discharged arises out of pre-petition fraud or other wrongful conduct and the debtor proposes only minimal repayment of these claims under the plan.* Similarly, a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims.

*Id*. at 152-153 (emphasis added).

Here, the Debtor is attempting to discharge Ms. Odom's equitable distribution debt,

which would not be available in Chapter 7. 11 U.S.C. § 1328(a)(2) (excepting from discharge in

22

Chapter 13 Section 523(a)(5) domestic support obligations but not providing an exception for

Section 523(a)(15) property settlement or equitable distribution obligations). On the other hand,

the desire of the Debtor to take advantage of Congress's intent in providing for the discharge of

his equitable distribution obligations in Chapter 13 does not amount to a fraud or other wrongful

conduct. *Compare In re Fulmer*, 535 B.R. 854, 860 (Bankr. M.D. Ala. 2015) ("A debtor . . . who

lawfully seeks a discharge in bankruptcy is not, by definition, acting in bad faith.") *with In re*

*Mitrano*, 472 B.R. 706, 711-12 (E.D. Va. 2012) (finding bad faith where: (a) debtor listed

virtually every claim in the case as being disputed, despite pre-petition judgments establishing

the claims; (b) debtor was sanctioned $88,000.00 pre-petition; (c) debtor proposed a repayment

plan of $10.00 per month; and (d) debtor's "egregious efforts to avoid his child support

restitution obligation" were well-documented). The Debtor in this case has never contested his

domestic support obligations and has not disputed the amount of the equitable distribution debt

to Ms. Odom. Further, the Court would not describe an 11% plan as being a "minimal"

repayment of Ms. Odom's debt.

The Debtor's desire to discharge his equitable distribution to Ms. Odom does not,

standing alone, warrant a denial of confirmation or dismissal of this case. It is only when such an

intent is coupled with other bad faith conduct that the Court will deny confirmation or dismiss

the case, under *Neufeld.* The Court, then, turns to examine the Debtor's pre-petition conduct in

his divorce case.

### B.   The Debtor's Pre-Petition Concealment of His Ownership Interest in City Floorcoverings.

The Debtor was not truthful in his deposition in his divorce case concerning his

ownership of a one-third membership interest in City Floorcoverings, as indicated above. ODOM

Ex. RR, p. 63. This alone, while not admirable, might not be enough to warrant a denial of

confirmation or a dismissal of the Debtor's bankruptcy case. Ms. Odom learned of the Debtor's

one-third ownership interest with sufficient time to engage an expert witness to value that

interest at the equitable distribution hearing in December 2013, testimony that the Circuit Court

accepted in placing a value of $689,000.00 on the Debtor's one-third interest.

More damning, though, was the Debtor's decision not to disclose the Redemption

Agreement and the receipt of $150,000.00 in proceeds for his one-third interest in City

Floorcoverings to Judge Kassabian in the January 15th hearing, and immediately thereafter in the

conference with Ms. Odom and her counsel. The funds were received on January 10, 2014. DR

Ex. 19. The Debtor's first payment out of the $150,000.00 in proceeds was made on January 24,

2014. DR Ex. 20. The Debtor, therefore, had the $150,000.00 in the bank at the time of the

January 15th hearing and post-hearing conference with Ms. Odom and her attorney.

The Debtor allowed the Final Decree of Divorce to be entered on March 14, 2014, with

no mention of the Redemption Agreement. He further filed a Motion to Amend the Final Decree

of Divorce in October 2015 – twenty-two months after the Redemption Agreement of December

2013 – with no mention of the Redemption Agreement. With only certain limited exceptions, the

Debtor did not pay any of the $150,000.00 to Ms. Odom on account of her equitable distribution

award. The Debtor concealed the Redemption Agreement from the Circuit Court and from Ms.

Odom in a plain effort to use the funds for other purposes, while negotiating for and receiving

additional time to pay the equitable distribution award.

This strategy to conceal the Redemption Agreement and the $150,000.00 in proceeds,

coupled with a delay in the payment of the $201,000.00 equitable distribution award, turned out

in hindsight to be spectacularly misguided. The Debtor chose to pay creditors who, with the

exception of the IRS, held dischargeable debt, while failing to make arrangements to pay the one

24

creditor who had the power to have him held in contempt and incarcerated (and who ultimately

did just that). He plowed a total of $68,200.00 (approximately 45% of the $150,000.00

redemption price) into Floor Covering Resources (DR Ex. 20), a business that by August 2015

the Debtor sold for no cash, only the assumption of its liabilities - liabilities for which Ms. Odom

gave a $99,325.00 credit in the Term Sheet and for which she never received any adjustment as a

result of Greenspring's assumption of those obligations.

The Debtor's intent to discharge Ms. Odom's equitable distribution debt, which would

not be dischargeable in a Chapter 7 case, coupled with his pre-petition concealment of the

Redemption Agreement from the Circuit Court and from Ms. Odom, and his use of all of the

$150,000.00 in proceeds without payment of virtually any of the equitable distribution award

when he had the opportunity to do so, causes the Court to sustain Ms. Odom's good faith

objection to the Debtor's Third Amended Plan.

### VI.   The Court Will Dismiss the Debtor's Bankruptcy Case Sua Sponte.

The Court has sustained Ms. Odom's Objections to the Debtor's Plan, for the reasons

stated above. This case has been pending since March 28, 2016, for about a year now, with no

confirmed Chapter 13 plan. This is the Debtor's Third Amended Plan, meaning that it is the

fourth Plan that the Debtor has proposed without achieving confirmation. More importantly, the

defects in the Debtor's Plan – a lack of good faith arising primarily out of pre-petition conduct in

his divorce case – cannot be remedied by the filing of an amended plan. The Court, therefore,

will enter a separate Order dismissing this case *sua sponte*.[13]

### CONCLUSION

For the foregoing reasons:

---

[13] The Debtor is free to file a petition under Chapter 7, should he so choose.

1.	The Court overrules Ms. Odom's Objections to the Debtor's Third Amended Plan on the grounds of eligibility, disposable income, failure to pay domestic support obligations and the liquidation test. 11 U.S.C. §§ 109(e), 1325(b)(2), 1325(a)(8) and 1325(a)(4).

2.	The Court sustains Ms. Odom's Objection to the Debtor's Third Amended Plan on the ground of good faith. 11 U.S.C. § 1325(a)(3).

3.	The Court will dismiss this case *sua sponte*.

4.	A separate Order shall issue.

5.	The Clerk will mail copies of this Memorandum Opinion, or will provide CM-ECF notice of its entry, to the parties below.

Date: __Apr 19 2017_____

Alexandria, Virginia

/s/ Brian F. Kenney
_____
Brian F. Kenney
United States Bankruptcy Judge

Entered on Docket: April 19, 2017

Copies to:

Henry Michael Curtis Brandland
11496 Links Drive
Reston, VA 20190
*Chapter 13 Debtor*

Gregory M. Wade, Esquire
616 N. Washington Street
Alexandria, VA 22314-1991
*Counsel for the Chapter 13 Debtor*

Lauren Friend McKelvey, Esquire
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
*Counsel for Creditor Sara Odom*

Thomas P. Gorman, Esquire
300 N. Washington St. Ste. 400
Alexandria, VA 22314
*Chapter 13 Trustee*